THE FIRST SAFE DEPOSIT NATIONAL BANK OF NEW BEDFORD, Libellant,

v.

Oil Screw Fishing Vessel NORTH STAR, her engines, boats, tackle, apparel and furniture, Respondent.

No. 60–10–J.  In Admiralty.

United States District Court
D. Massachusetts.

July 26, 1960.

Berthold Putman, Abramson, Titus & Levenson, Robert Genensky, New Bedford, Mass., for plaintiff.

Solomon Rosenberg, New Bedford, Mass., for defendant.

JULIAN, District Judge.

On motion of the libellant, holder of a preferred maritime mortgage on the fishing vessel North Star, this court entered an order on April 27, 1960, directing the sale of that vessel by the

U. S. Marshal on May 13, 1960. On May 10, 1960, the sale was postponed until further order of the Court.

The case was subsequently reassigned to me.

The sale was to include the vessel, her engines, tackle and all other items seized by the U. S. Marshal on March 17, 1960, pursuant to the warrant and monition issued by this court on March 15, 1960. Among the items so seized is a new pilot house of which the intervener, Normand C. Hudon, claims to be owner.

On March 18, 1960, Hudon filed a statement in this case laying claim to the pilot house, alleging that he is its sole owner and praying that it be returned to him forthwith. No action appears to have been taken on this claim.

On June 17, 1960, Hudon was granted leave to intervene. He seeks a determination of the "ownership and the right to possession of the pilot house by the court before the appraisal and sale of the vessel" and prays that the pilot house be returned to him.

On July 1, 1960, the libellant moved that the court set a new date for the sale of the vessel. No action has yet been taken on this motion.

On July 12, 1960, a hearing was held to determine whether the pilot house in question should be included in the sale.

The findings of fact that follow are based on the evidence introduced at that hearing.

In the latter part of October, 1959, Hudon, who is engaged in the business of repairing vessels, entered into an oral agreement with the owner to remove the old pilot house on the fishing vessel North Star, to install new coaming and a new steel trunk preparatory to the installation of a new pilot house and to build and install a new pilot house. The agreed price was $4,000.

Hudon removed and discarded the old pilot house. Thereafter, on or about October 21, 1959, the agreement was modified to include specified repairs to the part of the deck adjacent to the location of the pilot house for the additional price of $500. Hudon then repaired the deck and installed the coaming and the new steel trunk.

The preferred maritime mortgage to the libellant became effective on November 19, 1959. Before that date, Hudon had furnished a substantial amount of labor and materials for repairs to the North Star. Some of these repairs were included in the oral agreement mentioned and some were not.

Immediately prior to the time the mortgage became effective, Hudon, in consideration of libellant's making of a loan to the owner of the North Star, agreed in writing "to subordinate any and all claims and liens of any nature whatsoever, maritime or otherwise, which it [sic] may now have against the aforesaid vessel to the claims and liens of The First Safe Deposit National Bank of New Bedford," the libellant.

Hudon began to build the new pilot house about November 21, 1959, at his own shop which was situated about three miles from the place where the North Star was moored.

On November 28, 1959, Hudon received $1,500 from the owner of the vessel on account of the contract price of $4,500. The balance of $3,000 was to be paid after the pilot house was installed.

About the middle of January, 1960, the owner of the vessel informed Hudon that it was financially unable to make any further payments under their agreement. At that time the pilot house was near completion. Besides building the pilot house Hudon had continued to do other work on the vessel. He stopped doing this other work upon receiving notice of the owner's inability to pay.

He completed building the pilot house, however, and removed it from his shop to his mother's premises, some five miles away from the vessel, where it was found and seized by the U. S. Marshal on March 17, 1960, as one of the vessel's appurtenances ashore.

The seized pilot house is about 7 feet wide, 12 feet long, 7½ feet high, and

weighs between 1½ and 2 tons. None of the materials used to build it came from the vessel. It was designed and built for installation on the North Star, but it can be adapted to and installed on other vessels of the same type. The installation of the seized pilot house on the North Star would have required the use of tie rods and welding. It would also have been necessary to make it watertight. Upon installation the pilot house would have become physically an integral part of the vessel.

Hudon never delivered the seized pilot house to the owner of the North Star or aboard or near the vessel itself, but retained possession of it from the time he began to build it until it was seized by the U. S. Marshal. In view of the owner's admitted inability to make further payments, Hudon intended not to part with title or possession of the pilot house until he was paid the balance of $3,000. He has not received payment of that balance or any part of it; nor has all or any part of that amount ever been tendered to him.

Hudon has never asserted any lien or claim against the vessel for work done or materials used in the construction of the pilot house.

The mortgage covers "the whole of said oil screw or vessel together with all her engines, machinery, masts, bowsprits, boats, anchors, cables, rigging, tackle, apparel and furniture and all other appurtenances thereto appertaining and belonging, *and also any and all additions, improvements and replacements hereinafter [sic] made in or to said vessel* or any part thereof, or in or to her equipment and appurtenances." (Italics added.)

On these facts the seized pilot house never became part of the mortgaged vessel and was never furnished to the owner or to the vessel.

The owner of the vessel never acquired title to the seized pilot house.

Although it was designed and built to replace the old pilot house, it never in fact became a replacement, an addition or improvement to the vessel. It never became an "appurtenance ashore" of the North Star.

The statement made to Hudon by the owner of the vessel that the owner was unable to make any further payments justified Hudon in withholding delivery of the pilot house and discontinuing further performance of his agreement with the owner. Restatement, Contracts, section 280; Ragan v. Dyer, 1930, 272 Mass. 495, 172 N.E. 597; Nevins v. Ward, 1946, 320 Mass. 70, 67 N.E.2d 673.

The writing by which Hudon subordinated all claims and liens he may have had against the vessel at the time the writing was signed and delivered could in no way involve the seized pilot house since the latter was not then in existence.

The libellant relies on two cases, The Geisha, D.C.D.Mass.1912, 200 F. 865, and First Suffolk Nat. Bank of Huntington v. The Air Brant, D.C.E.D.N.Y.1954, 125 F.Supp. 709. It would seem, however, that the rule applied in each case is helpful to Hudon rather than the libellant. In The Geisha the Court stated (200 F. at page 868):

"It may not be necessary to prove that the materials have been actually incorporated into the vessel; but I cannot doubt that they must appear to have been delivered to her, either on board her, or at least 'within the immediate presence and control of her officers'."

In that case the libellant, who was in control of both the vessel and the wharf, had furnished certain boiler sections on the wharf "all ready to go on board" the vessel which lay alongside the wharf, and "would unquestionably have done the little remaining to do in order to get them on board, but for a condition of affairs for which the owner was solely responsible." In the circumstances of that case the court regarded delivery to the wharf "as the equivalent of delivery into the control of the vessel's officers." In our case there was no de-

livery or attempted delivery. Hudon intentionally withheld delivery. The seized pilot house had been continuously in the possession and under the exclusive control of Hudon several miles away from the vessel. In the First Suffolk National Bank case the items of equipment in question were installed aboard the vessels under a conditional sales agreement after the recording of the mortgage. It was held that upon installation these items became an integral part of the vessels, and a part of the res and were subject to process in rem regardless of title. In our case the pilot house was neither delivered nor installed and never became part of the vessel.

I hold that the pilot house is owned by Hudon; that it is not subject to the mortgage held by the libellant; that it may not be included in the sale; and that Hudon is entitled to its possession.

Accordingly, an order will be entered directing the U. S. Marshal not to include the seized pilot house in the sale, and further directing him to return the pilot house to Hudon.